Filed 1/5/23  CBGM v. Guralnick CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CBGM, LLC, | |
| Plaintiff and Respondent, | E078064 |
| v. | (Super.Ct.No. CVPS2000676) |
| WAYNE GURALNICK et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Chad W. Firetag, Judge. Reversed with directions.

Klinedinst and Dan Lawton for Defendants and Appellants.

No appearance for Plaintiff and Respondent.

Respondent CBGM, LLC, the owner of the La Quinta, California Trilogy Golf Course, alleged counsel for and the acting president of the Trilogy at La Quinta Maintenance Association, Inc. Board of Directors (HOA Board) committed fraud, negligent misrepresentation, and slander of title during negotiations over how the homeowners association and the golf course owners would divide the costs of repairing and maintaining a landscaped area on the periphery of the golf course.

The golf course owners alleged the representatives of the HOA Board made false promises concerning their control over the project and its costs that were not subsequently included in the controlling declaration of conditions, covenants, and restrictions (CCRs), which promises had induced them into signing. They also allege slander of title arising from the recording of the CCRs they say they were fraudulently induced to sign

After CBGM signed the CCRs, the HOA Board submitted a ballot measure to the homeowners, seeking approval of the rehabilitation project. The ballot measure focused primarily on convincing the homeowners to take on additional fees to fund the association's portion of the costs and ratify the proposed division of costs for the project between the golf course owners and the homeowners. The homeowners approved the rehabilitation project, and the HOA Board recorded the new CCRs. After their frustration grew with how the HOA Board was conducting the project, CBGM sued Guralnick, his law firm, and the board president, asserting causes of action for fraud, negligent misrepresentation, and slander of title.

Guralnick and his law firm filed an anti-SLAPP motion under Code of Civil Procedure section 425.16, subdivision (e)(4) (unlabeled statutory citations refer to this code) seeking to strike all three causes of action on the ground that they arise from protected statements on a public issue made during negotiations over the rehabilitation project. The trial judge, Riverside County Superior Court Judge Chad Firetag, denied the motion on the ground that the statements at the heart of the dispute did not occur in the context of an ongoing controversy, dispute, or discussion, which would warrant protection under the anti-SLAPP statute.

We conclude the pleadings and affidavits establish the rehabilitation project was the topic of ongoing discussions which concluded in a vote by homeowners, and that the challenged statements therefore qualify for anti-SLAPP protection. We therefore reverse the order denying the anti-SLAPP motion and remand for further proceedings, including a determination whether CBGM can show a probability that they will prevail on their claims.

## I

## FACTS

Due to the stage of this case, the facts we recount are as stated in the complaint and in declarations submitted in connection with the anti-SLAPP motion.

Respondent CBGM, LLC owns and operates Trilogy Golf Course in La Quinta, California. The golf course and a 61-acre landscaped perimeter area lie within a master-planned community, called Trilogy at La Quinta, which has 1,238 homes.

The homeowners belong to the Trilogy at La Quinta Maintenance Association, Inc. homeowners association (HOA), which isn't a party to this case. Appellant Wayne Guralnick is a lawyer who, together with his firm, Guralnick & Gilliland, LLP (also an appellant), represented the HOA Board at all relevant times. Gary Turner, another codefendant, is the HOA's former president, but he isn't a party to this appeal.

In 2003, the HOA recorded CCRs governing the golf course and the community. The CCRs state the golf course must be maintained and operated to meet high standards designed to sustain the prestige and value of the surrounding homes and development. From 2003 to 2006, the golf course was well run and hosted several professional tournaments.

In 2008, it was revealed during a presale inspection that acacia trees had been planted in the perimeter area, though the original landscaping plan called for dwarf acacia. The difference was important to homeowners because dwarf acacia grow to be about four feet tall, whereas acacia can grow as high as 25 feet. If not trimmed, the acacia trees would block views of the golf course, potentially diminishing home values. Trimming the acacia trees cost $400,000 to $600,000 a year. As a result, the HOA, not the golf course, was paying to maintain the perimeter area. According to CBGM's complaint, Guralnick was aware of the situation, and was also aware the cost of maintaining the perimeter area wasn't listed as a liability in the golf course's financial statements.

4

In early 2009, the golf course, clubhouse, and restaurant were sold to an investment group. The problem with the acacia trees and the high cost of maintaining them wasn't disclosed to the investment group during escrow. Instead, Guralnick advised the HOA Board to amend golf course CCRs to show the HOA would have a claim against the golf course owner for any maintenance deficiencies, including deficiencies related to the perimeter area. Between 2009 and 2014, the condition and operation of the golf course and its restaurant deteriorated, and the HOA Board eventually threatened litigation.

In August 2013, the investment group invited restauranteur Tom Brown to take over the operation of the restaurant under a lease. Brown made a significant investment, and conditions improved to such an extent that community leaders encouraged him to purchase the golf course. Eventually, Brown formed CBGM with a partner and completed the purchase in April 2015 for $5.1 million. Before the purchase, CBGM and the HOA Board signed an agreement which, among other things, temporarily suspended CBGM's responsibility to maintain the perimeter area. After the purchase, CBGM invested in significant improvements to the golf course.

In February 2016, the HOA Board and CBGM began negotiating over the replacement for their temporary agreement, set to expire in April 2017. Guralnick and Turner represented the HOA in these negotiations. CBGM employed outside legal counsel. Included in these negotiations were the overall rehabilitation of the perimeter area and a plan for its future maintenance. According to CBGM's complaint, "it was

[their] well communicated goal to keep the Perimeter Area annual maintenance costs below $225,000 per year and keep the rehabilitation costs below $2M. This was stated over and over again and accepted by the HOA Board and Guralnick."

In late 2016, CBGM and the HOA Board agreed to test vegetation on a small portion of the perimeter area with the goal of finding plantings that would keep the overall rehabilitation cost below $2 million and annual maintenance costs below $225,000. Everyone agreed at the time to allow the plantings in the test area to mature before making decisions about what would be planted in the perimeter area.

In early 2017, the plants were maturing as expected, but, according to CBGM, "the homeowners were growing restless as they wanted something done with the Perimeter Area almost immediately." They allege Guralnick and Turner "represented to [CBGM] that they needed an agreement relating to the Perimeter Area improvements and maintenance in place prior to a March 2017 vote of the homeowners." They said the improvement plan would likely be voted down at the scheduled March 23, 2017 homeowners meeting if they didn't reach an agreement before then. They alleged such a vote "would leave [CBGM] solely responsible for the 'deficiency' claims being made by the HOA and likely solely responsible for financing and improving the Perimeter Area." Though it's not entirely clear, it appears the HOA Board's position was that homeowner rejection of the new plan in March would leave CBGM responsible for all maintenance, including the expenses related to trimming acacia trees.

6

The parties proceeded to negotiate a restated declaration of covenants, conditions, and restrictions for the golf course (restated CCRs). According to CBGM, the restated CCRs would "define the project, payment responsibilities, the maximum price and provide a final or negotiated Rehabilitation Project Agreement . . . between [CBGM], the HOA Board and a third-party contractor and define the scope and costs of the improvements to the Perimeter Area." The restated CCRs, as negotiated, provided that CBGM and the HOA Board would each pay half the construction costs of restoring the landscaping in the perimeter area and half the annual maintenance costs. It also provided CBGM would pay its half of the construction costs with $225,000 in cash and in meal credits at the golf course restaurant for Trilogy homeowners.

According to Guralnick's declaration and supporting exhibits, the parties had reached an agreement about the restated CCRs by February 7, 2017. A CBGM representative sent an email to Guralnick on January 24, 2017 saying "the golf course has accepted the current edition." On February 7, 2017, Guralnick sent CBGM's representatives the proposed final version of the restated CCRs and noted they would immediately record the CCRs if they were approved by the vote of the HOA's membership.

On February 9, 2017, the HOA Board and CBGM met and signed the restated CCRs. At this meeting, CBGM was represented by its legal counsel and others. Guralnick attended the meeting as the HOA's corporate counsel, as did Turner and other HOA representatives. Section 16 of the restated CCRs said they "shall have no force or effect

unless the members of [the HOA] approve a ballot measure approving the Rehab Project and cost sharing for the Rehab Project and related maintenance for the Perimeter Landscaping Areas." The same provision says "If the Ballot Measure is approved . . . this Declaration shall be recorded against the Properties, [and] take effect immediately."

CBGM alleges the restated CCRs omitted material items, including any agreement about the type of vegetation to be planted, irrigation work, and cost sharing. According to CBGM, at the February 9, 2017 meeting, Guralnick and Turner told CBGM they "needed to sign the Restated CCRs by 4 pm that day or the entire financial participation from the homeowners and the HOA Board would be lost." CBGM noticed the rehabilitation project agreement was missing from the CCRs. Though it was supposed to be attached as Exhibit H, the document attached was instead a letter of credit authorizing the HOA to take periodic payments for maintenance in the perimeter area. CBGM complained that the rehabilitation agreement contained the most important terms and also complained of the provision giving the HOA "an exclusive easement over, under, above and within the Perimeter Landscape Areas to install, maintain, repair and replace all landscape, vegetation, trees, shrubs, ground cover (inclusive of all inert material), the irrigation system and all other improvements located within the Perimeter Landscape Areas." CBGM initially refused to sign the restated CCRs for these reasons.

According to CBGM, Guralnick and Turner then assured them "the HOA Board's control and absolute discretion had to be in the Restated CCRs to pass the homeowners' vote because of the significant effect the Perimeter Area's appearance has on the home

8

values." They represented the HOA would use the test planting area to choose what vegetation to plant and that CBGM would have a vote on vegetation choices. They promised initial construction costs wouldn't exceed $2 million, annual maintenance costs would be below $221,000, and maintenance costs wouldn't be included in the rehabilitation project agreement as a line item expense. They said the HOA Board would limit construction to two holes at a time and ensure proper dust control measures to protect the golf course during construction. Finally, they promised the restated CCRs would not be recorded without including the rehabilitation project agreement. According to CBGM, they signed the CCRs on February 9, 2017 based on these representations.

On February 14, 2017, the HOA Board presented the ballot measure to its homeowners for approval. Homeowners received a cover letter explaining the issues, a ballot, voting instructions, a map of the property, and answers to "frequently asked questions." The letter asked homeowners to review the ballot materials and indicate their approval or disapproval of the rehabilitation project for the perimeter area's landscaping, whose major terms it summarized as "[a]ccept[ing] an easement over the Perimeter Landscape Areas from the Golf Course Owner," entering an agreement with a landscape contractor to install and rehabilitate the perimeter area landscaping and irrigation system, and splitting evenly the cost of the rehabilitation project and the maintenance costs with the golf course owner. The ballot materials included information about the amount homeowners would have to pay on an individual basis to cover rehabilitation and

9

maintenance costs, indicated they expected maintenance to cost about $221,000 per year, and said the golf course would provide water for irrigation.

The homeowners approved the ballot measure on March 23, 2017, and Guralnick subsequently recorded the restated CCRs.

CBGM wasn't happy with how the HOA proceeded under the new CCRs. They complained the HOA and Guralnick "steamed forward" with construction plans, excluded CBGM from meetings with a landscape architect, and made decisions on their own damaging CBGM's ability to run the golf course profitably. CBGM claimed they had been shut out of control of their property and had been fooled into paying for costly changes made by the HOA acting alone. As the dispute continued, CBGM came to believe they were losing hundreds of thousands of dollars in golf dues, greens fees, cart fees, events, food and beverage sales, and merchandise sales while work went on in the perimeter area.

According to CBGM, Guralnick and Turner began sending homeowners newsletters slandering CBGM "citing the inaccurate and admittedly defective Restated CC&Rs, denying any blame or culpability and instead, demanding that [CBGM] cover for their budgetary mistakes."

CBGM claimed to have suffered millions of dollars in damages caused by closures, construction delays, and damaged goodwill. They said these injuries resulted from Guralnick and Turner fraudulently inducing them into signing the restated CCRs.

10

In June 2020, the HOA initiated an arbitration proceeding against CBGM. Six months later, CBGM filed this lawsuit, asserting causes of action for fraud, negligent misrepresentation, and slander of title against Turner, Guralnick and his law firm. Guralnick and his firm filed an anti-SLAPP motion.

On October 18, 2021, the trial judge issued a tentative ruling denying the motion because Guralnick hadn't carried his initial burden of proving CBGM's claim arose from protected activity. The judge acknowledged his statements affected numerous homeowners and therefore "may be a topic of a wide public concern." However, he concluded Guralnick and his law firm "have not demonstrated that the subject matter of their negotiations and discussions with CBGM, regarding the responsibilities and maintenance of the golf course and Perimeter Area, was a topic of an ongoing debate by the homeowners of the Trilogy community to show that statements made during these negotiations and discussions concerned an issue of public interest. The judge heard oral argument the following day, but adopted his tentative ruling as a final ruling.

Guralnick and his law firm filed a timely notice of appeal.

## II

## ANALYSIS

"A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the

exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." (*Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 129 (*Colyear*) [cleaned up].)

The Legislature acted to protect such political activities by enacting an anti-SLAPP statute, concluding "it is in the public interest to encourage continued participation in matters of public significance, and . . . this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).) To reduce the financial harm of meritless SLAPP suits, the statute authorizes the filing of a special motion to strike a cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)

When a defendant seeks protection from a lawsuit by filing a motion to strike, the courts undertake a two-step analysis to determine if striking the cause of action is warranted. (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson*).) First, we ask whether the defendant made a prima facie showing that the plaintiff's cause of action arises from an act by the defendant in furtherance of their right of petition or free speech in connection with a public issue. (§ 425.16, subd. (b)(1).) If the answer to that question is yes, the cause of action shall be stricken unless the plaintiff can establish a probability that the plaintiff will prevail on the claim. (*Simpson*, at p. 21.) "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from

12

protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

We review a trial judge's decision on a special motion to strike de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) We consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We don't weigh credibility or make decisions based on the weight of the evidence, but "accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [cleaned up].)

In this appeal, we're called upon to determine whether Guralnick's acts were protected conduct. We evaluate whether Guralnick has demonstrated his statements fit one of the four categories of conduct set forth in section 425.16, subdivision (e): "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

13

Guralnick concedes section 425.16, subdivisions (e)(1), (e)(2), and (e)(3) don't apply because the conduct CBGM complains of occurred in private negotiations over the terms of the CCRs and not in a legislative, executive, or judicial proceeding, other official proceeding authorized by law, or even in a public forum. Instead, he argues the anti-SLAPP protections apply because CBGM's causes of action arise from conduct in furtherance of the right of free speech in connection with a public issue or issue of public interest, protected under subdivision (e)(4).

"Section 425.16 does not define an issue of public interest. Nevertheless, the statute requires the issue to include attributes that make it one of public, rather than merely private, interest. A few guiding principles can be gleaned from decisional authorities. For example, public interest is not mere curiosity. Further, the matter should be something of concern to a substantial number of people. Accordingly, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. Additionally, there should be a degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest that can be connected to the specific dispute is not sufficient. One cannot focus on society's general interest in the subject matter of the dispute instead of the specific speech or conduct upon which the complaint is based. Cases that have found an issue of public interest have done so where the subject statements either concerned a person or entity in the public eye, conduct that could directly affect a large number of

14

people beyond the direct participants or a topic of widespread, public interest." (*Colyear*, *supra*, 9 Cal.App.5th at p. 131 [cleaned up].)

As such, "public interest" may extend beyond government matters to embrace "private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 115.) In such cases— those of interest "to a limited, but definable portion of the public (a private group, organization, or community)"— the protected activity must "occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme*, at p. 119.)

Guralnick appeals to these principles to argue his statements made during negotiations with CBGM over the terms relating to landscaping in the perimeter of the golf course should be treated as protected conduct because they concerned matters of interest to the entire community over which there were active discussion and ultimately a vote of homeowners. He is right that appellate courts have extended protections to conduct that occurred in the context of disputes within a homeowners association. (E.g., *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1468 (*Ruiz*).)

In *Ruiz*, a homeowner sued his homeowners association alleging letters written by the homeowners association's counsel had defamed him. (*Ruiz*, *supra*, 134 Cal.App.4th at pp. 1463-1465.) The letters addressed a dispute about the rejection of Ruiz's architectural

plans for his home and Ruiz's complaints the architectural committee was applying the homeowners association guidelines arbitrarily. (*Ibid*.) The Court of Appeal concluded the attorney's letters fell within section 425.16 (e)(4) because they were written during an ongoing dispute between Ruiz and the homeowners association over the denial of Ruiz's plans and the application of the association's architectural guidelines, and the dispute was of interest to the residents of 523 lots because they "would be affected by the outcome of those disputes and would have a stake in [HOA] governance." (*Ruiz*, at pp. 1467-1469.) The court emphasized that the attorney's letters "were part of the ongoing discussion over those disputes and 'contribute[d] to the public debate' on the issues presented by those disputes. " (*Id.* at p. 1469.)

We see little difference between *Ruiz* and the facts of this case. If anything, the case for concluding that Guralnick's statements concerned matters of public interest is stronger. The pleadings and affidavits submitted in relation to the anti-SLAPP motion establish that the HOA Board was engaged in the long-term project of rehabilitating the landscaping on the perimeter of the golf course and negotiating a cost sharing agreement with the golf course to accomplish that end. The matter was important to all the homeowners in the development—more than 1,200 families. And the issue of how to resolve the problem, either by enforcing the old CCRs or renegotiating new CCRs, was a matter placed for a vote by the homeowners, who in fact approved the agreement the HOA Board and CBGM signed. Under these circumstances, we conclude Guralnick's statements in negotiating the terms of the agreement and convincing CBGM to sign it did

16

concern a matter of public interest that occurred in the context of an ongoing controversy, dispute, or discussion. We therefore conclude the trial judge erred by holding Guralnick did not establish his acts were protected conduct under section 425.16, subdivision (e)(4).

Though we don't have the benefit of a respondent's brief, the trial judge relied on *Talega Maintenance Corp. v. Standard Pacific Corp.* (2014) 225 Cal.App.4th 722 (*Talega*) to support his holding that Guralnick's statements were not protected. We find *Talega* distinguishable. That case involved, among other things, a dispute between an HOA and developers over representations the developer's employees made about who was responsible for repairing trails adjacent to the community, which were badly damaged during heavy rains and flooding in 2005. (*Id.* at p. 725.) At the time, three employees represented the developer, Talega Associates, on the homeowners association board of directors, and they made up a majority of the board. (*Id.* at p. 726.) By 2005, the title to the damaged property had transferred to the homeowners association, and the developer board members represented that the association was responsible to pay for repairs to the trails. (*Ibid.*) The homeowners association expended more than half a million dollars based on that understanding. However, when rains again damaged the trails in 2010, independent board members hired consultants to investigate, and they discovered the developers had in fact been responsible for repairing damage to the trails all along. (*Id.* pp. 726-727.) The homeowners association sued the developers and their three employees for, relevant here, breach of fiduciary duty, fraud, constructive fraud,

17

and negligence, claiming the developer board members knew in 2005 the developers were responsible for the cost of repairing the trails. (*Ibid.*)

The developers filed an anti-SLAPP motion seeking to strike all those causes of action, but the trial judge denied the motion after concluding the developers "have not demonstrated that [their conduct] involved a matter of sufficient public interest." (*Talega*, *supra*, 225 Cal.App.4th at p. 727.) On appeal, the Court of Appeal, Fourth District, Division Three, determined "[t]here is no indication in the record that there was any controversy, dispute, or discussion surrounding the Developer Board Members' representation that the HOA was liable to pay the repair costs. To the contrary, a declaration submitted by an independent board member states, 'I believed [the Developer Board Members'] representations, as I had no reason to believe at the time that they were not telling me the truth or acting in the best interest of the Association.'" (*Id.* at p. 734.) The Court of Appeal concluded "the absence of any controversy, dispute, or discussion . . . [about] the issue of who was to play for the repairs, which was of interest to only a narrow sliver of society, [shows it] was not a public issue." (*Ibid.*) The trial court here found the facts analogous and followed *Talega* in concluding the Guralnick had failed to demonstrate "the subject matter of their negotiations and discussions . . . regarding the responsibilities of rehabilitation and maintenance of the golf course and the Perimeter Area, was a topic of an ongoing debate by the homeowners."

*Talega* is factually distinguishable from this case. As we discuss above, we conclude the uncontested fact that the homeowners were preparing to vote on a ballot

18

measure to approve the rehabilitation plan for the area surrounding the golf course establishes that the subject matter of the negotiations did concern an ongoing matter of discussion or controversy among the homeowners. And while it is true that the subject matter of the allegedly fraudulent statements in *Talega* and this case are similar—both concerned the extent to which a homeowners association (and therefore homeowners) would be responsible for costs associated with repairing and maintaining common areas—the fact that the HOA Board was actively trying to gain approval from the homeowners for their proposal distinguishes this case. In *Talega*, the Court of Appeal found it important that one of the independent board members admitted he had simply accepted the developers' representations without question. That dynamic isn't present here. The problems with the condition of the landscaping in the perimeter area was a problem of longstanding, and Guralnick was negotiating a solution to the problem with the golf course owners and then took the issue to the homeowners to get their approval for the negotiated allocation of responsibility. We conclude that's enough discussion of an issue affecting enough people to warrant anti-SLAPP protection.

Our conclusion that Guralnick's conduct was protected doesn't mean he and his law firm are entitled to have the complaint stricken. CBGM may still defeat the motion if they can establish a probability they will prevail on their claims. (*Simpson*, *supra*, 49 Cal.4th at p. 21.) Since the trial judge did not decide that issue, and respondents have not briefed the issue in this court, we conclude the better course is to remand for the trial judge to make that determination in the first place.

# III

## DISPOSITION

We reverse the trial judge's order denying the anti-SLAPP motion and remand for a determination whether CBGM has a probability of prevailing on the merits of their claims. Appellants shall recover their costs of appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH         
J.

We concur:

McKINSTER      
      Acting P. J.

FIELDS        
      J.